**Laura A. Fine**, OSB No. 882057
Email: AttorneyLauraFine@gmail.com
PO Box 1240
Veneta, OR 97487
Telephone: (541) 341-4542
Facsimile: (541) 341-4543
Cell Phone: (541) 729-2957
**Attorney for Plaintiff**

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| **K.J.**, <br><br> Plaintiff, <br><br> v. <br><br> **THE STATE OF OREGON by and through the OREGON YOUTH AUTHORITY, DAVID MOLSTAD,** <br><br> Defendants. | Case No. 6:25-cv-01973 <br><br> **COMPLAINT** <br><br> Civil Rights Violation <br> Due Process <br> (42 U.S.C. § 1983) <br><br> Oregon Tort Claims Act <br> Negligence <br> (Or. Rev. Stat. § 30.260 *et seq*) <br><br> Jury Trial Demanded |

Plaintiff K.J., by and through his attorneys, hereby alleges:

### NATURE OF ACTION

K.J. has filed a civil rights lawsuit under 42 U.S.C. § 1983 and Or. Rev. Stat. § 30.260, alleging that during his time in the custody of the Oregon Youth Authority (OYA) at McLaren Youth Correctional Facility (MacLaren), he was subjected to sexual abuse by Doctor Edward Gary Edwards ("Dr. Edwards"), a long-time pediatrician providing medical care to youths at

Maclaren since 1977. The sexual abuse of K.J first occurred in 2010 when he was 17 years old and transferred to McLaren to receive medical treatment. When K.J. reported the abuse to Defendant David Molstad ("Molstad"), the Treatment Manager on Kincade Cottage at Maclaren, Molstad told K.J. that he was deflecting from his own crimes and that, if continued to claim sexual abuse against Dr. Edwards, K.J. would be failed in his treatment and transferred to a more secure housing unit. K.J. also reported the sexual abuse to his father, who called a staff on Kincade to inquire into what his son reported. A staff on Kincade told K.J.'s father that there was nothing to worry about and that that K.J. was just exaggerating things to avoid taking responsibility for their own crimes. Rather than report K.J.'s allegations of sexual abuse or take other action to prevent his abuse, Molstad allowed K.J. to be continually exposed and abused by Dr. Edwards. Molstad's manipulation of K.J. as cover for Dr. Edwards sexual abuse, and Molstad's interference with K.J.'s ability to bring claim against Dr. Edwards to protect himself from that abuse violated K.J.'s statutory and constitutional rights.

## JURISDICTION AND VENUE

1.

This Court has subject matter jurisdiction over Plaintiff K.J.'s claims for violation of federal constitutional rights pursuant to 28 U.S.C. §§ 133 and 1343 because the causes of action arise under 42 U.S.C. § 1983. This Court has supplemental jurisdiction of K.J.'s pendent state law claims under 28 U.S.C. § 1367.

2.

Venue is proper in the District of Oregon pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to K.J.'s claims occurred in the District of Oregon and because Defendants are subject of personal jurisdiction in the District of Oregon.

## PARTIES

3.

Plaintiff K.J. ("K.J.")[1] is an 33-year old adult resident of the State of Oregon. At all times relevant and material, he was in the physical custody of the Oregon Youth Authority ("OYA") at MacLaren Youth Correctional Facility ("MacLaren") operated by OYA in Marion County Oregon.

4.

The OYA was at all times relevant the agency of the State of Oregon responsible for exercising custody and supervision over youth offenders committed to OYA by order of a juvenile court or by decision of the Oregon Department of Corrections ("DOC"). Under the Oregon Tort Claims Act, OYA is subject to liability for the torts of its officers, employees, and agents acting within the scope of their employment or duties.

5.

Defendant DAVID MOLSTAD ("MOLSTAD") was at all times relevant a treatment manager at the Kincade Cottage of Maclaren in 2010 and who was acting within the course and scope of this employment with OYA. His official duties and responsibilities included, but were not limited to, the delivery of services and coordination of programs in the facility, including responding to grievances made by youth within Kincade Cottage. He is sued in his individual capacity.

---

[1] K.J. is proceeding under pseudonyms because of the sensitive and embarrassing nature of the allegations contained herein while K.J. was a child. K.J. will be filing a motion to proceed under pseudonym concurrently with this complaint.

## GENERAL ALLEGATIONS

### Factual Allegations on OYA's Failure to Protect Youth From Abuse

6.

Since 2005, OYA claims that it is committed to "a zero-tolerance policy towards sexual and other threats of harm" as part of its implementation of the 2003 Prison Rape Elimination Act ("PREA").[2] The PREA created federal standards for preventing, detecting, monitoring, and responding to sexual abuse in both adult and juvenile custody settings. "With a goal of being a national leader," OYA boasts that it quickly began implementing the standards set out in PREA. To that end, OYA created a Professional Standards Office ("PSO") to supposedly document, track, and investigate allegations of abuse. Staff were required to report any knowledge, suspicion, or youth reports (verbal or written) of abuse or harassment."

7.

Despite this alleged implementation of PREA, OYA has a long history of ignoring reports of staff sexually abusing youth in its facilities and of fostering an environment where unchecked sexual abuse could thrive. This environment stems from OYA failing to timely investigate the large backlog of reports of abuse within its facilities, failing to properly train staff, failing to report known incidents of sexual abuse to external investigative agencies, failing to provide adequate legal resources and access to courts, and failing to implement policies that would protect youth from sexual abuse by staff.

///
///
///

---

[2] Oregon Youth Authority Issue Brief: Protecting Youth Offenders from Sexual Victimization (February 2011).

**Factual Allegations on Dr. Edwards' Abuse of Youth**

8.

At all relevant times, EDWARD GARY EDWARDS ("EDWARDS"), who is deceased, was employed or otherwise working on behalf of OYA as a pediatrician providing medical examination, diagnosis, and treatment to youths at MacLaren since 1977. In or around 2003, a claim for harassment was filed against EDWARDS, including allegations of EDWARDS "lunging" at a nurse. Per the OYA superintendent at the time, "the fallout from the incident * * * has been considerable." EDWARDS remained a physician at MacLaren despite the complaint.

9.

EDWARDS was dubbed "Dr Cold Fingers" by youth and staff alike at MacLaren because he was infamous for fondling youths' genitals and penises with cold, ungloved hands during exams and stroking youths' genitals until erect under the pretext of medical necessity and procedure. EDWARDS performed these acts during the intake exams, follow-up physicals, and unrelated medical visits in his exam room when no nurse or chaperone was present.

10.

As explained below, OYA caused K.J. to believe that OYA consented to EDWARDS conduct and K.J. reasonably relied upon this belief. EDWARDS and Defendant's employment and service on behalf of OYA made them agents and/or apparent agents of OYA.

///
///
///

**Factual Allegations of Abuse of K.J. by Edwards**

11.

K.J. was born January 28, 1992. He was prosecuted as an adult for crimes he committed as a child. DOC transferred K.J. to the physical custody of OYA in 2009 because DOC and OYA determined that because of K.J.'s age, immaturity, mental or emotional condition or risk of physical harm K.J. should not be incarcerated initially in a DOC institution.

12.

In December 2009, K.J. was transferred to Hillcrest Youth Correctional Facility in Salem, Oregon. While at Hillcrest, K.J. had a medical emergency appendectomy on Christmas Eve, requiring immediate surgery.

13.

In early January 2010, K.J. was transferred to Maclaren to be treated by EDWARDS for complications related to his recent surgery. Maclaren staff escorted K.J. to EDWARDS examination room and left K.J. alone with him. The door to the examination room was closed. EDWARDS told K.J. that he needed to perform a physical as part of his examination and that K.J. needed to remove his sweats and underwear. K.J. asked EDWARDS why he needed a physical examination since he had just received one a month prior at Hillcrest. EDWARDS responded by saying a physical was part of the normal intake and his job. When K.J. undressed, EDWARDS had K.J. stand before him. EDWARDS was seated on a stool. EDWARDS rolled both of K.J.'s testicles. EDWARDS then lifted, rolled, and stroked K.J.'s penis with his ungloved hands. EDWARDS continued to manipulate K.J.'s penis in this manner for about 10 minutes while K.J.'s penis repeatedly became erect and relaxed. EDWARDS told K.J. that his penis "looked nice" and that his "doctor did a good job on his circumcision" and that it was

"very healthy and handsome." EDWARD then tended to the medical problem K.J. had asked to have treated.

14.

From K.J.'s initial meeting with EDWARDS until his transfer in February 2016 to DOC, EDWARDS met with K.J. on approximately eleven times and touched his genitals in a manner similar to the initial incident described above regardless of the ailment or medical request.

15.

As a direct and proximate result of EDWARDS' and Defendant OYA's wrongful conduct, K.J. incurred and/or will incur medical expenses for counseling and psychiatric/psychological treatment of approximately $100,000.

16.

Directly because of EDWARDS's and Defendant OYA's wrongful conduct, K.J. has suffered emotional pain and dysfunction, shock, anxiety, avoidance, depression, diminished self-esteem and sense of security, disruption of life, diminished quality of life, wounded trust in the intention of others, especially medical professionals, which has required and will continue to require counseling and other mental health treatment. All of these injuries caused and will continue to cause K.J. noneconomic damage in the approximate sum of $1,000,000, the exact amount to be determined by a jury at trial.

**Factual Allegations on Molstad's Obstruction of the Complaint Procedure**

17.

After leaving his medical appointment, K.J. immediately reported his interaction with EDWARDS to the staff at Kincade Cottage. Staff at Kincade told him that the appropriate process to complain was to submit a written complaint to MOLSTAD, the unit manager, in the

wooden drop box beside MOLSTAD's office door. K.J. submitted a complaint within days of the incident with EDWARDS.

18.

The same day as the medical appointment, K.J. called his father and described what EDWARDS had done to him during his medical appointment. K.J.'s father called a staff on Kincade and reported what K.J. had told him had occurred with EDWARDS. The staff told K.J.'s father that the youth on Kincade are always exaggerating things that go on there to their parents to get a reaction and often reflected the youth's denial of responsibility for their criminal adjudication. The staff told K.J.'s father there was nothing to worry about.

19.

A couple of days after K.J. filed his complaint, MOLSTAD summoned K.J. to his office to address the complaint. The assistant treatment manager was in the office. MOLSTAD told K.J. that before his complaint could move to the next step, he needed to discuss it with K.J. MOLSTAD asked K.J. to explain what happened with EDWARDS. K.J. explained the incident. MOLSTAD leaned back in his chair, looked at K.J., and said he needed to stop trying to get out of his punishment, that K.J. needed to take accountability for his own criminal actions before he accuses a professional of doing his job. MOLSTAD told K.J. that he understood that his crime distorted his thinking and that K.J. was trying to minimize his being an offender by trying to become a victim. MOLSTAD said that he knew EDWARDS for a long time and that he could never imagine the incident happening. MOLSTAD accused K.J. of inciting an incident with other "inmates" (a misnomer for youth in custody commonly used by MOLSTAD) that would impact their treatment. MOLSTAD told K.J. that if he did not stop speaking about this incident

he would deem K.J. a treatment failure and transfer him to Troy, which was a more restrictive housing unit.

20.

After his conversation with MOLSTAD, K.J. spoke to his mentor staff about the incident who told K.J. that he needed to "let it go" because it would only create conflict for him.

21.

As a result of MOLSTAD's actions, K.J. doubted that abuse had occurred and was occurring each time he met with and was inappropriately touched by EDWARDS. K.J. trusted what MOLSTAD, a treatment manager, had told him and K.J. internalized that his thinking was distorted and a symptom of criminal thinking errors. K.J. believed that EDWARDS actions were medically appropriate based on a combination of EDWARDS expertise, MOLSTAD's treatment of K.J.'s complaint and threat of punishment and denial of treatment if continued, and the normalization and Maclaren staff's knowledge of EDWARDS' physical examination of K.J. and other children. K.J. reasonably relied on this belief to forgoing filing additional complaints, administrative remedies, or seeking redress for his injuries with the courts.

22.

As a direct and proximate result of MOLSTAD's and OYA's wrongful conduct, K.J. incurred and/or will incur medical expenses for counseling and psychiatric/psychological treatment of approximately $100,000.

23.

Directly because of MOLSTAD's and OYA's wrongful conduct, K.J. has suffered emotional pain and dysfunction, shock, anxiety, avoidance, depression, diminished self-esteem and sense of security, disruption of life, diminished quality of life, wounded trust in the intention

of others, especially medical professionals, which has required and will continue to require counseling and other mental health treatment. All of these injuries cause and will continue to cause K.J. noneconomic damage in the approximate sum of $1,000,000, the exact amount to be determined by a jury at trial.

**DISCOVERY OF HARM**

24.

Plaintiff realleges paragraphs 1 through 23.

25.

Each of Plaintiff's claims set out herein are timely for one or more of the following reasons:

a. Plaintiff is under 40 years old and therefore his claim is timely under ORS 12.117.
b. Any limitation applicable to Plaintiff's claims were tolled based on minority;
c. Any limitations periods applicable to Plaintiff's claims were tolled based on a disabling mental condition;
d. Any limitations periods applicable to Plaintiff's claims were equitably tolled or Defendants are otherwise equitably estopped from attacking Plaintiff's claims on timeliness grounds;
e. Less than two years have elapsed since Plaintiff discovered that the conduct by Defendants was negligent or otherwise actionable;
f. Less than two years have elapsed since Plaintiff discovered his injuries and the causal role that Defendants' conduct played in his injuries.

26.

Less than two years before the date of this complaint, Plaintiff discovered the causal

connection between his abuse, the resulting injuries distinct from the abuse itself, and the responsibility of Defendants in causing those injuries. Plaintiff did not discover (and could not reasonably have discovered) at an earlier time the causal connection between the abuse and the damages suffered as a result of the abuse. The psychological effects of the abuse Plaintiff suffered prevented him from discovering the causal connection between the child abuse and the damages they suffered as a result of the abuse. Plaintiff's claims are timely pursuant to ORS 12.117.

27.

Notice of claim is not required for claims against Defendants by a claimant who was under 18 years of age and in OYA custody when the acts or omissions giving rise to the claim occurred. To the extent notice of claim was required against any Defendant under ORS 30.275, Plaintiff timely provide such notice by the filing of this lawsuit.

**COUNT ONE – Negligence**
**(Oregon OTCA)**
**(Against State of Oregon)**

28.

Plaintiff realleges paragraphs 1 through 27.

29.

By taking custody of K.J. and acting *in loco parentis* toward them during the period of their confinement, the State entered into a special relationship with K.J. At all material times, Defendants were in a special relationship with K.J. by virtue of their statutory obligations to children in their care generally and to K.J. specifically. As his physical custodian, Defendants

owed K.J. a heightened duty of care to provide a safe environment and to protect K.J. from abuse and injury while in OYA's care.

30.

Defendants' conduct and care were unreasonably below the applicable standard of care and negligently and unreasonably created a foreseeable risk of harm constituting child abuse to K.J. in one or more of the following particulars:

a) In allowing for extended and unmonitored individual interaction between EDWARDS and youth;

b) In failing to notice, investigate, or intervene to protect K.J. from EDWARDS inappropriate and sexual conduct towards K.J.;

c) In failing to properly supervise EDWARDS;

d) In failing to properly heed, investigate, or otherwise take any action in response to reports of inappropriate conduct and sexual abuse by EDWARDS;

e) In failing to report or refer reports of inappropriate conduct and sexual abuse by EDWARDS to external investigative agencies; and

f) In failing to properly vet, hire, train, and retain qualified personnel, including medical providers, corrections officers, and other facility staff.

31.

As a result of OYA's negligence, K.J. suffered the harm and damages alleged herein.

**COUNT TWO – Civil Rights Violation**
**(Due Process – Violation of Fourteenth Amendment)**
**(Against Molstad)**

32.

Plaintiff realleges paragraphs 1 through 31.

33.

MOLSTAD was working within the course and scope of his employment as a staff in MacLaren at the OYA when he engaged in the wrongful conduct alleged above.

34.

At all times relevant, MOLSTAD was acting under the color of law.

35.

Under the Prison Litigation Reform Act ("PLRA") of 42 USC § 1997e(a), a prisoner must exhaust available administrative remedies before bringing an action in federal court respecting prison conditions.

36.

The complaint process at Kinkaid Cottage, described above, was an adequate administrative remedy for K.J. to address EDWARDS abuse.

37.

At all relevant times, MacLaren did not have a legal library or adequate legal resources.

38.

MOLSTAD's conduct, described above, threatened K.J. with denial of treatment and transfer to more restrictive housing unit if K.J. did not cease his complaint against EDWARDS and in manipulating K.J. to believe he was fabricating his experience with EDWARDS caused the loss of K.J.'s opportunity to sue and seek relief for that injury. As a direct result of MOLSTAD'S conduct, K.J. did not further his complaint against EDWARDS and thereby satisfy the PLRA or timely bring suit with the limitations period.

39.

Until the recent media attention brought against EDWARDS, K.J. did not know or believe he had been abused by EDWARDS; instead, K.J. reasonably believed MOLSTAD's characterization of K.J.'s abuse by EDWARDS to be untrue and the result of K.J.'s criminal thinking.

40.

Based on the facts alleged above, K.J. would have asserted non-frivolous claims for EDWARDS conduct, including deliberate indifference under the Eighth Amendment of the United States Constitution or Article I, section 16 of the Oregon Constitution against MacLaren officials for the failure to protect K.J. from EDWARDS' abuse. K.J. would have been able to seek an injunction and money damages against EDWARDS, preventing any future abuse against K.J.

41.

K.J. would have asserted MOLSTAD violated the prohibition against cruel and unusual punishment under the Eighth and Sixteenth Amendments as follows:

a. In failing to take action to prevent EDWARDS abuse by reporting it to supervisors and investigative authorities;

b. In failing to ensure that corrective action was taken and that K.J. was protected from future abuse by EDWARDS;

c. In failing to comply with PREA standards, as implemented in OYA, to report K.J.s abuse and prevent future abuse.

42.

The statute of limitations and death of EDWARDS have foreclosed the claims and relief described above.

43.

As a result of MOLSTAD's violations of K.J.'s Fourteenth Amendment right, K.J. was repeatedly physically and sexually abused for six years. Accordingly, plaintiff is entitled to compensatory and punitive damages against MOLSTAD in an amount to be determined at trial for the violations of 42 USC § 1983 and for K.J's attorney fees and costs under 42 USC § 1988.

## **PRAYER FOR RELIEF**

44.

WHEREFORE, K.J. prays for judgment against Defendants as follows:

1. On First Claim for Relief for Negligence against State Defendant:
    a. Economic damages in the amount of $100,000;
    b. Noneconomic damages in the amount of $1,000,000;
    c. Costs and disbursements incurred herein.

2. On the Second Claim for Relief for Civil Rights Violation – 14th Amendment Due Process against MOLSTAD:
    a. Economic damages in the amount of $100,00;
    b. Noneconomic damages in the amount of $1,000,000;
    c. Attorney fees incurred herein pursuant to 42 U.S.C. § 1988;
    d. Costs and disbursements incurred herein; and
    e. Any other relief that the Court deems necessary.

DATED: October 24, 2025          /s/ Laura A. Fine
                                 _____
                                 Laura A Fine, OSB # 882057